## Weisen v. Showa Denko K.K.

72

C.P. of Allegheny County, no. GD 93-3087.

*Fred J. Lagatutta,* for plaintiff.
*Frederick W. Bode III,* for defendants.

FRIEDMAN, *J.,* October 3, 1996—All defendants have filed a single motion for summary judgment, based on their contention that plaintiff's action was commenced after the expiration of the applicable statute of limitations. Because there is a genuine issue of material fact as to when the "discovery rule" commenced the running of the statute of limitations, we must deny the motion.

Before addressing the merits of the defendants' motion, it should be noted that defendants have denied generally virtually every factual allegation of the complaint, based on the 1994 changes to Pa.R.C.P. 1029, which eliminate, supposedly only for negligence cases, the usual rule that a general denial is the equivalent of an admission. While this court initially did not understand the modified Rule 1029 to have had that extreme effect, a review of the comments to subsection (e) of the rule suggests that defendants may very well be correct. In any event, since the only motion before us is that of defendants, regarding the statute of limitations issue, that is the only issue we will address. The merits and consequences of the change from a fact pleading requirement for all parties, to a modified federal notice pleading system for negligence defendants only, will not be discussed herein.

The Superior Court has described the high standard which must be met in order for summary judgment to be granted in "discovery rule" cases in the case of *A. McD. v. Rosen,* 423 Pa. Super. 304, 308, 621 A.2d 128, 130 (1993):

"In applying the discovery rule, whether a plaintiff should have made a timely discovery of his or her

injury is generally an issue for the jury unless the undisputed facts lead unerringly to the conclusion that the time it took to discover an injury was unreasonable as a matter of law."

After a review of the undisputed facts on the issue of when plaintiff knew or should have known both that she was injured and that defendants caused her injury, we cannot conclude *as a matter of law* that the length of time plaintiff claims she took to discover the source of her injury was unreasonable.

This action was commenced on February 22, 1993. Plaintiff alleged in her complaint that, from July 1989 through November 1989, she purchased and consumed tablets of L-tryptophan which were manufactured, distributed, sold or processed by the defendants. (Complaint, paragraphs 16, 17, 18, and 20.) She alleged that shortly thereafter she developed symptoms which were subsequently diagnosed as eosinophilia/myalgia syndrome and fibromyalgia. (Complaint, paragraph 21.) EMS is a syndrome which is marked by an unexplained high eosinophil count (a type of white blood cell) and myalgia (muscle pain). Defendants concede in their motion that EMS was first reported and recognized by the medical community *no earlier* than November 1989. However, defendants also indicated to the court during oral argument on the instant motion that "they have not yet been able to identify . . . what the etiology is" for EMS and that "they have not been able to duplicate it with lab rats and mice." (Videotape record of proceedings of August 30, 1996, tape time 12:25.)

Plaintiff states in her affidavit that, in November 1989, she became informed via a televised report that some L-tryptophan was "contaminated" and had caused some people to become ill with a condition called "EMS,"

and that she then stopped taking L-tryptophan. She says that prior to and during November 1989 she had been under medical care for "various problems including asthma" and was taking several prescription medicines. She states that during November and December 1989 she had complained to a Dr. Levine at the Falk Clinic of "muscle pain, weakness, fatigue, joint pain, shortness of breath, rash, confusion and irritability," and that, after tests and examinations, she was informed that she "had an elevated 'white count' that was getting 'better' and that there was nothing to worry about." She states in her affidavit that the doctors offered no explanation for the cause of her complaints. (This last statement contradicts the statement of Dr. Wolanski which is discussed *infra.*)

In plaintiff's affidavit she also states that she then went to Dr. Johnstone, who said that he was concerned that she was suffering a recurrence of a problem with her hip. She informed him of the television report she had seen regarding the L-tryptophan, but he said "he didn't know anything about L-tryptophane [sic]." Dr. Johnstone referred her to a Dr. Baum because he thought her pain might be coming from her back. Dr. Baum told her that her problems were not caused by her back. Dr. Johnstone then told her that he could not determine the cause of her problems and sent her to a Dr. Sweeney. (It is undisputed that Dr. Sweeney told plaintiff on February 25, 1991 that she had EMS and fibromyalgia and that Dr. Sweeny also told her that those conditions were caused by "contaminated" L-tryptophan.)

One of the physicians who treated plaintiff, Dr. Wolanski, testified in his deposition that he saw plaintiff on November 20, November 27, and December 11, 1989. He testified that she had muscle aches, allergy symptoms, and asthma. (Wolanski deposition, p. 11.)

He assessed her as having asthma and a possible reaction to the L-tryptophan. (p. 13.) He ordered a complete blood count differential for her because he was concerned that she had EMS. (p. 15.) The blood count showed that her eosinophil count was elevated. (p. 16.) Because of this elevated count another physician, Dr. Levine, filled out "an eosinophilia/myalgia case report form with the CDC [Centers for Disease Control]" (p. 16.) In his notes from the November 27 visit, under "assessment and plan," he wrote "eosinophilia/ myalgia syndrome." (pp. 18-19.) He told her "to get off L-tryptophan . . . because she had eosinophilia/myalgia syndrome." (p. 19.) When asked if he had told plaintiff that she had EMS, he replied, "I always go over the assessment and plan with the patient and I tell them what their diagnosis is," and that he had no reason to think that he had altered from that practice. (p. 19.) In his notes of the December 11 visit, he wrote, "Assessment and plan number one. Eosinophilia/myalgia syndrome. Doing better with time. No further tests necessary. CDC form completed. Assessment number two. Was chronic asthmatic bronchitis. Continue medications as described above." (p. 22.) He again testified that he goes over his assessment and plans with his patients. (p. 23.) He had not ruled out any other causes for the myalgia. (p. 26.) He had no independent recollection of any of his conversations with plaintiff. (p. 28.)

Dr. Johnstone, who had been plaintiff's physician since 1980, was also deposed. He testified that he had notes of a history of plaintiff dated March 15, 1990, stating "history, asthma, L-triptophane [sic], got blood disease in November of 1989, still with pains in legs and calf." (Johnstone deposition, pp. 8-9.) He testified that the note was a quote from plaintiff taken down by one of his staff people. (p. 9.) He also testified

that he had made a handwritten note on the same page stating "Has EMS? Secondary to L-tryptophan," and that the note reflected what plaintiff had told him. (p. 12.)

The conflict between what plaintiff says she was told by Dr. Wolanski and what Dr. Wolanski says he must have told her raises a dispute of material fact. Similarly, whether plaintiff said the words Dr. Johnstone noted as having been said by her, and, if the words were said, what their probable meaning was, are material facts in dispute. Such disputes must be decided by a jury. "[O]nly where the facts are so clear that reasonable minds cannot differ may the commencement of the limitations period be determined as a matter of law." *Hayward v. Medical Center of Beaver County,* 530 Pa. 320, 325, 608 A.2d 1040, 1043 (1992).

The crucial issue is not, as defendants suggest, when plaintiff first began to *suspect* that the symptoms she was experiencing might be the newly described syndrome, EMS, and that the symptoms might possibly be linked to her use of L-tryptophan. Rather it is when reliable medical advice told her this causal connection was so. It will be for the jury to decide whether Dr. Wolanski in fact told her of this causal connection so as to start the running of the period of limitations earlier.

This ruling is also consistent with our Unified Court System's judicial policy, as expressed in 42 Pa.C.S. §2503(9), to discourage unfounded litigation. Section 2503(9) punishes the frivolous *institution* of civil actions. Had plaintiff filed her lawsuit as early as November 1989 (the time that defendants say the statute of limitations begins to run) on mere suspicion that a televised report of a recently noticed syndrome possibly associated with L-tryptophan usage was accurate and the causal connection valid, she might very well

have subjected herself and her attorney to sanctions under section 2503(9). In fact, while this memorandum opinion was being drafted, the Pennsylvania Supreme Court rendered a decision, *Thunberg v. Strause,* 545 Pa. 607, 682 A.2d 295 (1996), in which it affirmed the imposition of defendant's counsel fees on a plaintiff for *initiating* suit against the driver of a car that hit her after another car pushed her into its path. Plaintiff's theory, according to footnote 3, was "that [the defendant] had been using his car phone and that had he not done so, he would have been able to see [plaintiff's] onrushing vehicle and would have been able to avoid the resulting collision as he travelled lawfully on a public highway." *Id.* at 614 n.3, 682 A.2d at 299 n.3.

If *Thunberg* is indeed a harbinger of the adoption of "the English rule" regarding counsel fees, as the dissent of Justice Ralph J. Cappy suggests, how doubly wrong it would be to also hold plaintiffs such as Ms. Weisen to a requirement that the statute of limitations begins to run under the "discovery rule" based on nothing more than a television report. Suppose that plaintiff's suit was filed shortly after she saw the television report, without consulting her physician. Suppose also that defendants are victorious after trial. Under *Thunberg,* plaintiff could be held liable for defendants' counsel fees for instituting her suit without adequate pre-complaint investigation. How unfair, then, to suggest that her claim be barred because of the "knowledge" she had acquired from a television program.

In summary, there is conflicting testimony as to when *plaintiff* knew or *should* have known that her physical ailments were indeed *reliably* believed by the medical community or her own physicians to have been caused by defendants' product, L-tryptophan. A television report casually heard is not the kind of reliable information

litigants are automatically charged with acting upon. Furthermore, as previously indicated, the material factual disputes raised by the depositions of Dr. Wolanski and Dr. Johnstone, and the affidavit of plaintiff are for a jury to evaluate. We must therefore deny defendants' motion for summary judgment and leave the issue of the bar of the statute of limitations to a jury.

See accompanying order.

## ORDER

And now, to-wit, October 3, 1996, for the reasons stated in the attached memorandum, it is hereby ordered that defendants' motion for summary judgment be and hereby is denied.